UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SHERRIE A. WILLIAMS, | Case No. 0:07-CV-4210 (PJS/RLE) |
| Plaintiff, | |
| v. | |
| OFFICER ANN PADDEN, in her official and individual capacity; OFFICER REBECCA KOPP, in her official and individual capacity; OFFICER TODD SHERMER, in his official and individual capacity; and the CITY OF DULUTH, | MEMORANDUM OPINION AND ORDER |
| Defendants. | |

Bryan R. Battina, BOCK & BATTINA, LLP, for plaintiff.

M. Alison Lutterman, DULUTH CITY ATTORNEY'S OFFICE, for defendants.

Plaintiff Sherrie Williams brings claims for negligence under state law and for violation of her constitutional rights under 42 U.S.C.§ 1983 against Duluth police officers Ann Padden, Rebecca Kopp, and Todd Shermer (collectively, "police-officer defendants") and the City of Duluth. Defendants move for summary judgment on Williams's claims. For the reasons that follow, the Court grants summary judgment to all defendants.

I.  BACKGROUND[1]

*A.  The Caution Alert*

Williams and her seven-year-old son, along with forty or fifty others, attended a barbecue in the Morgan Park neighborhood of Duluth on May 10, 2007.  Frasier Aff. Ex. A ("Williams Dep.") at 82-83 [Docket No. 96].  Williams left her son with a friend at the barbecue and went to take a shower at her home in Duluth's West End, about eight miles away.  *Id.* at 78-79.  While she was at home, someone was shot in Morgan Park near the site of the barbecue, and one of Williams's friends called to let her know about the shooting.  *Id.* at 80.  Williams returned to Morgan Park to pick up her son.  They got stuck in Morgan Park because of traffic and the police investigation.  *Id.* at 81-86.  When Williams and her son finally arrived home at about 1:00 a.m., Williams saw someone riding off on her son's bicycle.  *Id.* at 87. Williams followed the bicycle thief in her car while calling 911 on her cell phone, but she hung up when the operator asked for her name.  *Id.* at 87, 92; Padden Aff. [Docket No. 62] Ex. 1 at 1.  When she got home, Williams noticed that the front door of her apartment was open and, suspecting that someone had broken in, she again called 911.  Williams Dep. at 87-88; Padden Aff. Ex. 1 at 1.

Officer Ann Padden of the Duluth Police Department was dispatched to Williams's home in response to her 911 calls.  Padden Aff. Ex. 1 at 1; Padden Aff. ¶ 3.  Notes in the department's computer-assisted dispatch system indicated that Williams was agitated and uncooperative.

---

[1]The facts are vigorously disputed, but, for purposes of deciding defendants' summary-judgment motions, the Court accepts as true Williams's version of events.  The Court also accepts as true evidence offered by defendants that Williams has not challenged.

The Court does not discuss Williams's interactions with Officer Brian Jones because, although he was named in the complaint, the parties stipulated to the dismissal of all claims against him.  Stip. of Dismissal [Docket No. 113]; Order of Dismissal [Docket No. 114].

Padden Aff. Ex. 1 at 1.  When Padden arrived at Williams's home, Williams and her son were waiting outside.  Williams Dep. at 76.

Padden asked Williams about the bike.  Padden Aff. ¶ 5 at 2.  Williams said that it had been stolen by a "white, f—ing, meth-head user." *Id.* ¶ 5 at 2 (alteration in original).  Padden asked Williams to calm down, and Williams said, "No, f—k that, I'm not going to calm down." Padden Aff. ¶ 5 at 2 (alteration in original).  Padden also asked Williams why she was coming home so late and where she had been.  Williams Dep. at 89.  Williams replied that she had picked up her son in Morgan Park.  *Id.* at 89-90.  Padden (who knew about the Morgan Park shooting) asked Williams why she was in Morgan Park, whom she knew there, and what she had been doing there.  *Id.* at 89.  At some point, Padden walked through Williams's apartment to make sure that nobody was inside.  *Id.* at 90-91.

Padden then asked Williams to show her where the bike thief had gone.  *Id.* at 91-92. Williams agreed to do so but said that she first wanted to get her gun.  *Id.* at 92-93.  As Williams began walking toward her apartment, Padden asked her to stop.  Padden Aff. ¶ 5 at 3.  Williams replied that she had "a f—king permit" for the gun, *id.*, and offered to show Padden both the permit and papers that showed that Williams had been the target of threats.  Williams Dep. at 92-

93.  Padden stayed outside while Williams went into the apartment to get her gun.[2]  *Id.* at 95.

Williams also gathered the permit and the other papers to show to Padden.  *Id.*

According to Williams, Padden entered Williams's apartment and asked to see the gun

and the permit.  *Id.* at 95-99.  When Williams said that the gun was in her purse, Padden grabbed

the purse, pulled out the gun, unloaded it, reloaded it, argued with Williams about what kind of

gun it was, and gave the gun and the purse back to Williams.  *Id.* at 96-102.  Padden asked

Williams if she had any more guns in the apartment and why the gun was not in a holster.  *Id.*

at 96, 102.  Williams showed Padden her holster and said that she could not wear a holster with

her dress.  *Id.* at 102.  Williams never objected to Padden's presence inside her home.  Padden

Aff. ¶ 5 at 4.

Williams and Padden went back outside, and Padden again questioned Williams about the

Morgan Park shooting.  *Id.* at 102-103.  With Williams leading the way, Padden and Williams

then drove to the house that Williams believed the bike thief had entered earlier.  *Id.* at 103-04.

When they arrived, Padden looked around but did not see the bike.  *Id.* at 104; Padden

Aff. ¶ 7.  Padden told Williams not to confront the suspect and to call the police if she learned

anything more about the stolen bike.  Padden Aff. ¶ 7.  Padden then told Williams to leave, and

Williams returned home.  Williams Dep. at 104.

---

[2]Padden's version of the story diverges from Williams's at this point.  According to
Padden, she followed Williams to the front door and again asked her to stop.  Padden Aff. ¶ 5
at 3.  Williams said that the gun was in her purse on the couch.  As she looked for her permit,
Williams told Padden that she had the gun because she feared her ex-boyfriend would hurt her.
*Id.* ¶ 5 at 3-4.  Padden looked at the purse and saw the gun inside.  Padden did not take the gun
out of the purse, unload it, or reload it.  Padden *Id.* ¶ 5 at 4.  Padden told Williams that it was
against the law to keep a gun in a way that a child could gain access to it.  *Id.*  Padden's warning
further angered Williams.  *Id.*  Padden said that she was just advising Williams of the law and
was not going to charge her.  *Id.*

Padden contacted the 911 operator to say that Williams was agitated, had a gun, feared gang retaliation, was in Morgan Park at the time of the shooting, and possibly had a relationship to the shooting. Padden Aff. ¶ 8 at 5. Padden wanted this information to be available to other officers who might respond to Williams's address in the near future. *Id.* Although 911 operators can place what is known as a "caution alert" or "premise event" on a particular address, Padden did not expect the 911 operator to do so, because Padden did not fill out the form that generally leads to placement of such an alert. *Id.* ¶ 8 at 6. As it happens, however, the 911 operator *did* place a caution alert on Williams's address as a result of Padden's call. *Id.* ¶ 9.

### B. Williams's Sick Child

A few weeks later — on June 4, 2007, at around 2:45 a.m.— Williams called 911 to report that her son had a high fever. Williams Dep. at 131. A dispatcher sent Officer Rebecca Kopp to Williams's apartment and told Kopp that there was a caution alert on Williams's address. Kopp Aff. ¶¶ 1-2 [Docket No. 71]. Because of technical limitations of the dispatch system, Kopp did not know the reasons for the caution alert, only that a caution alert had been placed. *Id.*

According to Williams,[3] when Kopp arrived, Kopp opened Williams's unlocked front door without knocking and drew her gun. Williams Dep. at 131-34. Kopp asked Williams if she

---

[3] Kopp's version of events differs significantly from Williams's. According to Kopp, she knocked on the door, and Williams let her in. Kopp Aff. ¶ 3. Kopp then told Williams that medical personnel were on the way and asked if anyone else was in the apartment. *Id.* Kopp stayed in Williams's living room the entire time she was there. *Id.* When Shermer and some emergency medical technicians ("EMTs") arrived, Williams "flipped out" and would not let the EMTs care for her son. *Id.* ¶ 4. After paramedics arrived and assessed Williams's son, everyone left the apartment. *Id.* ¶ 6. Outside, Williams continued to yell and scream, at which point Kopp threatened to arrest Williams for disorderly conduct if she did not calm down. *Id.* As noted below, Kopp's version of events is corroborated by affidavits submitted by the EMTs.

had called 911 and then told her to step aside. *Id.* at 132-33. Kopp spent about a minute walking through Williams's apartment with her weapon drawn, doing a protective sweep. *Id.* at 133-34, 139-40. Officer Todd Shermer arrived next. *Id.* at 140.

Williams asked Kopp in a loud voice why she was there instead of an ambulance and why she had drawn her gun. *Id.* at 141. Kopp said that they had to clear her apartment first and told Williams to be quiet. *Id.* at 141. Kopp also asked Williams who else was in the apartment. *Id.* at 142. Kopp did not ask Williams any questions about her son and did not attend to him. *Id.*

Kopp and Shermer repeatedly told Williams to calm down and shut up. *Id.* at 142-44. Emergency medical technicians ("EMTs") from the fire department arrived ten minutes after Shermer and looked in on Williams's son, but did not do anything to help him.[4] *Id.* at 145-46. Williams asked Kopp and Shermer to leave, but they refused, saying that they had to protect the other emergency personnel from Williams. *Id.* at 143-44.

Paramedics arrived in an ambulance some time after the EMTs. *Id.* at 150-51. The paramedics agreed to take Williams's son to the hospital. *Id.* at 150-51. Kopp offered the paramedics a police escort, which they declined. Kopp. Aff. ¶ 7. Everyone left Williams's home together. Williams Dep. at 152-53.

---

[4]According to the EMTs, Kopp had arrived only moments before they did. Rogers Aff. ¶ 3 [Docket No. 73]; Rindal Aff. ¶ 2 [Docket No. 74]; Hanson Aff. ¶ 2 [Docket No. 75]. Shermer arrived immediately after the EMTs. Rogers Aff. ¶ 3. Williams became angry when the EMTs and Shermer entered her apartment, and she refused to let the EMTs assess her son's condition. Rogers Aff. ¶¶ 3-4; Rindal Aff. ¶ 3; Hanson Aff. ¶ 3. The EMTs eventually left Williams's home and stood in the stairwell while the officers attempted to calm Williams down. Rogers Aff. ¶ 4; Hanson Aff. ¶ 4.

### C. Williams's Complaint to the Duluth Police Department

Williams went to the Duluth Police Department the next day to complain about Kopp's and Shermer's behavior.  Williams Dep. at 154, 156-57.  Deputy Chief Mike Tusken told Williams that Padden had placed a caution alert on her address, although he did not know why. *Id.* at 155.  Tusken forwarded Williams's complaint to Lieutenant Kerry Kolodge.  *Id.* at 156; Kolodge Aff. ¶ 1 [Docket No. 67].

Kolodge called Williams to follow up, and Williams initially screamed, yelled, and "ma[de] race an issue."  Kolodge Aff. ¶ 5.  When she calmed down, Williams told Kolodge that she was upset about three things:  that the caution alert was put on her home, that the make of her gun was misidentified, and that she was erroneously identified as being related to people involved in the Morgan Park shooting.  *Id.*

Some time later, Kolodge followed up by talking to Padden.  Kolodge decided that Padden acted reasonably when she provided the information that led to the placement of the caution alert on Williams's address.  *Id.* ¶ 6.  Kolodge also decided, however, that "there was no longer any need for the cautionary comments to continue" and directed the 911 service to remove the caution alert from Williams's address.  *Id.* ¶ 7.

Kolodge spoke with Williams by phone twice more in June and followed up each phone conversation with a letter.  Kolodge Aff. ¶¶ 8-9 & Exs. 2-3.  Kolodge explained that Padden had placed the caution alert on Williams's address because Williams had just come from Morgan Park, had a handgun in her purse, and knew some of the people involved in the Morgan Park shooting.  Kolodge Aff. Ex. 2 at 1.  Kolodge also told Williams that the caution alert would be

removed and that certain information about Williams in police records had been corrected.  *Id.* at 2.

Williams filed this suit in October 2007.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B.  Williams's Claims

Williams's claims can be divided into two groups.  The first group — including negligence, procedural due-process, substantive due-process, and equal-protection claims — arises out of Padden's encounter with Williams in May 2007 and the caution alert that was placed on her address after that encounter.  The second group consists of substantive due-process claims arising out of Williams's interactions with Kopp and Shermer in June 2007.

Williams's negligence claim arises under Minnesota law.  Williams brings her federal claims under 42 U.S.C. § 1983, which forbids states and state actors from depriving "any citizen

of the United States or other person within the jurisdiction thereof . . . of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  The essential elements of a § 1983 claim are: (1) violation of a constitutional right, (2) by a state actor, (3) who acted with the requisite culpability and (4) thereby injured the plaintiff.  *Kuha v. City of Minnetonka*, 365 F.3d 590, 606 (8th Cir. 2003), *overruled in part, Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395-95 (8th Cir. 2007) (en banc).

The central dispute in this case with respect to Williams's § 1983 claims is whether any defendant violated Williams's constitutional rights.  (The police-officer defendants are obviously state actors.)  The Court considers in turn: Williams's claims against Padden; Williams's claims against Kopp and Shermer; the defense of qualified immunity; and Williams's claims against the City of Duluth.

### 1.  Claims Against Padden

#### a.  Procedural Due Process

The Due Process Clause of the Fourteenth Amendment forbids states to "deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1.  To prevail on her procedural due-process claim, Williams must establish two things.  First, she must show that she was deprived of a life, liberty, or property interest protected by the Fourteenth Amendment.  Second, she must show that the state deprived her of that interest without providing adequate process.  *See Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000).

Williams contends that Padden and Duluth violated her procedural due-process rights "by placing a caution alert on her address without cause."  Pl. Mem. Opp. S.J. ("Pl. SJ Opp.") at 11

[Docket No. 95].  Specifically, Williams contends that as a result of the caution alert, her "statutorily established liberties to possess a [handgun] with a permit and to have free access to emergency services without undue harassment from police officers" were infringed.  *Id.*  And although Williams's complaint is less than clear on the matter, in light of some language in the complaint, a citation in Williams's brief opposing summary judgment, and Williams's arguments at the summary-judgment hearing, the Court understands Williams to be contending that the caution alert deprived her of her liberty interest in her reputation.[5]

The Supreme Court "has not attempted to define with exactness" what constitutes a "liberty interest" under the Fourteenth Amendment.  *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer*).  Constitutionally protected liberty interests may arise from two sources: the Due Process Clause and state law.  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983); *see also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (quoting *Hewitt*).  Not every interest created by state law is protected by the Due Process Clause.  *See Meis v. Gunter*, 906 F.2d 364, 369 (8th Cir. 1990) (holding that it "is emphatically not the law" that "every state statute which imposes a mandatory duty, or creates a legal right, is constitutional in nature").  Only when a state law creates a "legitimate claim of entitlement" to an interest is that interest protected by the Due Process Clause.  *Thompson*, 490 U.S. at 460.  Thus, when a state grants a person "the right to a certain

---

[5]Williams asserts in her complaint that the caution alert "destroys [her] character . . . ." 2d Am. Comp. ¶ 27.  In her brief opposing summary judgment, Williams quotes this language from *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971): "'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'"  Pl. SJ Opp. at 11 (quoting *Constantineau*).  And at the summary-judgment hearing, Williams's counsel said that Williams suffered "stigma" as a result of the caution alert.  SJ Hr'g Tr. at 4.

outcome in the event of the occurrence of certain facts," the state creates a protected liberty interest, and the person has a right under the Due Process Clause "to whatever process is due in connection with the determination of whether those facts exist."  *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993); *see also Thompson*, 490 U.S. at 462-63.

The Court considers each of Williams's asserted liberty interests in turn.

### (1)  Possessing a Handgun

Although Williams has not discussed the Minnesota statute governing handgun possession, the Court assumes (and defendants do not dispute) that Williams has a right under state law to possess a handgun, provided that she qualifies for a permit.[6]  And the Court assumes, without deciding, that Minnesota's handgun-permit law creates a liberty interest in possessing a handgun if a person satisfies the statutory criteria for a permit.  It follows that Williams was entitled to "whatever process is due in connection with the determination" of whether she satisfies those criteria.  *Bagley*, 5 F.3d at 328.

---

[6]The Second Amendment of the Constitution also protects Williams's right to possess a firearm.  *Heller v. District of Columbia*, 128 S. Ct. 2783, 2797 (2008).  But it is not clear whether the Second Amendment should be incorporated against the states through the Fourteenth Amendment.  *See United States v. Fincher*, 538 F.3d 868, 873 n.2 (8th Cir. 2008) (noting that *Heller* did not address the incorporation question); *Edwards v. City of Goldsboro*, 178 F.3d 231, 252 (4th Cir. 1999) ("[T]he law is settled in our circuit that the Second Amendment does not apply to the States.").  Such incorporation is a necessary precondition to the enforcement of constitutional rights against the states by means of 42 U.S.C. § 1983.  *See Paul v. Davis*, 424 U.S. 693, 710 n.5 (1976).

Because Williams has not asserted that she was deprived of her Second Amendment rights, the Court need not consider a claim based on her constitutional right to bear arms.  The Court notes, however, that a Second Amendment claim would fail for the same reason that Williams's state-law-based procedural due-process claim fails:  She was not deprived of her right to possess a handgun, nor was that right burdened in any meaningful way.

But Williams does not contend that she was deprived of any procedure with respect to possessing a handgun.  Indeed, it is undisputed that Williams possessed a handgun with a permit both before and after the various incidents that gave rise to this lawsuit.  Thus, to the extent that Williams contends that the Due Process Clause was violated because she was deprived of her liberty interest in possessing a handgun with a permit, her claim fails, because the undisputed facts establish that she was *not* deprived of that interest.[7]

The gist of Williams's claim, however, seems to be not that she was *deprived* of her right to possess a handgun, but rather that her right to possess a handgun was impermissibly *burdened*. That is, Williams seems to contend that when a caution alert was placed on her home in part because she possessed a handgun, this was an unconstitutional burden on her right to possess the gun.  The Court disagrees.

Williams's right to possess a handgun is not unlimited.  Further, Williams has identified no state statute creating a right on Williams's part to the caution-alert-free possession of a handgun.  *See Thompson*, 490 U.S. at 460; *Bagley*, 5 F.3d at 328.  And even if the fact of the caution alert somehow burdened Williams's right to possess a handgun, the burden was minimal under the circumstances.  There were legitimate reasons to warn police officers that there was a gun in Williams's home.  Specifically, the presence of the gun made the home more dangerous (even if Williams had a permit), because the gun could have fallen into the hands of someone

---

[7]Williams was deprived of physical possession of her gun for a brief period when Padden allegedly loaded and unloaded it.  Even if this were the basis of Williams's procedural due-process claim — and the Court doubts that it is — this momentary deprivation was too brief to constitute an actionable deprivation of Williams's right to possess a handgun.  *Cf. Conn v. Gabbert*, 526 U.S. 286, 292 (1999) (holding that the liberty interest in practicing one's profession is not violated by "the inevitable interruptions of our daily routine as a result of legal process which all of us may experience from time to time").

other than Williams — such as the person whose threats to Williams were the occasion for her

acquiring the gun.  Accordingly, Williams's § 1983 claim with respect to the handgun fails

because she was not deprived of any constitutionally protected liberty interest with respect to her

handgun when a caution alert was placed on her home.

### (2)  Emergency Medical Services

Williams contends that she was deprived of her "statutorily established libert[y] . . . to

have free access to emergency services without undue harassment from police officers."  Pl. SJ

Opp. at 11.  It is unclear what, exactly, Williams means by "undue harassment."  Even taking her

version of events as true, the "harassment" of the officers appears to have involved doing a

protective sweep of the apartment (an apartment on which a caution alert had been placed) and

telling an agitated Williams to calm down.  There is no evidence that the officers delayed the

arrival of the paramedics or interfered in any way with the provision of emergency medical

services to Williams's son.

Apart from arguing — without citation to supporting authority — that there is a

"statutorily established" right to emergency services free of such "harassment," Williams has not

explained how this ostensible liberty interest arises under either the Due Process Clause or under

Minnesota law.  *See Hewitt*, 459 U.S. at 466.  The Court is not persuaded that the right to

"harassment-free" emergency services is a liberty interest that can support a procedural due-

process claim.  Accordingly, even if the actions of Kopp and Shermer in doing a protective

sweep of the apartment and telling Williams to calm down amounted to "harassment" of

Williams, and even if the caution alert caused that harassment, the Court finds that this

harassment did not infringe a protected liberty interest.  Accordingly, Williams's procedural due-process claim based on the right to harassment-free emergency services fails.

### (3)  Reputation

Williams contends that the placement of the caution alert deprived her of her liberty interest in her reputation.  But Williams has no liberty interest in her reputation alone.  *See Paul v. Davis*, 424 U.S. 693, 712 (1976); *Gunderson v. Hvass*, 339 F.3d 639, 644 (8th Cir. 2003) ("Damage to reputation alone, however, is not sufficient to invoke the procedural protections of the due process clause.").  Rather, to make out a reputation-based procedural due-process claim, Williams must establish both that she suffered some stigma (i.e., damage to her reputation) and that she suffered some other tangible burden in connection with that stigma.  *Gunderson*, 339 F.3d at 644.  Such claims are thus known as "stigma-plus" claims.  *Id.*; *see also O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005) (holding that "plus" portion of "stigma-plus" claim must be a "tangible and material burden").

Williams argued at the summary-judgment hearing that the caution alert contained false information that was published to police officers and that her reputation was harmed as a result.  SJ Hr'g Tr. at 4.  Even if this satisfied the "stigma" portion of the stigma-plus test (and the Court has its doubts), Williams has no evidence of the "plus" portion of the test.  That is, there is no evidence that Williams suffered any tangible burden in connection with the purportedly stigmatizing information in the caution alert.  The only consequence of the caution alert to which Williams can point is that Kopp and Shermer did a protective sweep of her apartment when they responded to her 911 call on June 4, 2007.  As explained above, this was a "burden" without

constitutional significance.  Williams's reputation-based procedural due-process claim therefore fails.

### b.  Substantive Due Process

The substantive component of the Due Process Clause of the Fourteenth Amendment forbids states to deprive citizens of certain rights, regardless of the process associated with such deprivation.  But the range of liberties protected by the substantive due-process doctrine is much narrower than the range protected by procedural due process.  Substantive due-process protection extends only to "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quotations and citations omitted); *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (en banc) (Bye, J., concurring) (citing *Glucksberg*).  And when executive action, rather than legislation, is challenged, a plaintiff must show both that the challenged action violated a fundamental constitutional right *and* that the action "shocks the conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (citing *County of Sacramento*).

The shocks-the-conscience test is, by its nature, imprecise.  *See County of Sacramento*, 523 U.S. at 847 ("[T]he measure of what is conscience-shocking is no calibrated yard stick . . . .").  The test "points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."  *Id.* at 848.  We know, however, from *Daniels v. Williams*, 474 U.S. 327, 328 (1986), that mere negligence will never give rise to a substantive due-process violation.  *See also O'Connor,* 426 F.3d at 203.  And we also know, from *County of*

*Sacramento*, that in the context of a high-speed car chase, only if the pursuing police officer deliberately intended to harm his quarry would the officer's action shock the conscience. 523 U.S. at 854. Finally, if the government owes a special duty of care to a person in its charge, then deliberate indifference toward that person can support a substantive due-process claim. *Id.* at 849-50.

According to Williams, Padden's actions "in entering Williams['s] house without invitation, taking her gun, arguing about the gun and the Morgan Park shooting, and implying Williams was involved in the shooting, is conduct that is offensive to human dignity, and is a clear violation of substantive due process." Pl. SJ Opp. at 13-14. The Court disagrees. As noted in the preceding section in connection with Williams's procedural due-process claims, no reasonable jury could find that Padden deprived Williams of *any* constitutional right, much less a constitutional right of such a fundamental nature that "neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720 (quotations and citations omitted). This alone suffices to defeat Williams's substantive due-process claim against Padden.

Further, there is no evidence in this case of conscience-shocking behavior on Padden's part. At worst, Padden acted rudely in questioning Williams too aggressively and needlessly handling her firearm.[8] But there is no evidence that Padden deliberately intended to harm

---

[8]Although Williams complains that Padden entered her apartment without permission, Williams has not raised a Fourth Amendment claim. Even if Williams had raised such a claim, Padden would be entitled to summary judgment on the substantive due-process claim. "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). The Court therefore finds that Padden's entry into Williams's apartment, even if it was against Williams's wishes, cannot support a substantive due-process claim.

(continued...)

Williams.  And even if Padden owed Williams a special duty of care — something the Court

doubts — there is no evidence that Padden was deliberately indifferent to Williams's needs.  In

short, the substantive component of the Due Process Clause does not protect citizens from the

type of rude behavior alleged by Williams, and thus Padden is entitled to summary judgment on

Williams's substantive due-process claim.  *Cf. Norris v. Engles,* 494 F.3d 634, 636-38 (2007)

(finding no substantive due-process violation where plaintiff was handcuffed for about three

hours to a floor grate that served as an open toilet).

### c.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment forbids a state to "deny to any

person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

This provision requires that states treat similarly situated persons alike.  *Creason v. City of

Washington*, 435 F.3d 820, 823 (8th Cir. 2006).

To prevail on an equal-protection claim, a plaintiff must show that the challenged

government action both had a discriminatory effect and was motivated by a discriminatory

purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).  To establish discriminatory

effect in a race-discrimination case, the plaintiff must generally show that similarly situated

individuals of a different race were treated differently.  *See id.*; *see also Klinger v. Dep't of Corr.*,

31 F.3d 727, 731 (8th Cir. 1994).  Such evidence of discriminatory effect, combined with some

evidence (even indirect) of a discriminatory motivation, entitles the plaintiff to prevail.

Alternatively, the Court assumes that a plaintiff can prevail on an equal-protection claim by

---

[8](...continued)
Moreover, that entry was not, under the circumstances, conscience-shocking.

proving, with direct evidence, that a government actor took a challenged action because of racial animus, and that the plaintiff was harmed by that action. *See United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005); *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) ("We will assume that a prima facie equal protection claim may also be proved by direct evidence of racial discrimination in this type of case [i.e., a selective-enforcement case]."); *Clark v. Pielert*, No. 07-3649, 2009 U.S. Dist. LEXIS 126, at *22, 2009 WL 35337, at *8 (D. Minn. Jan. 5, 2009).

Williams contends that the caution alert was placed on her home because she is African-American, in violation of the Equal Protection Clause. Specifically, in her complaint, Williams alleges that "white [handgun-]permit holders did not have caution alerts placed on their addresses." 2d Am. Compl. ¶ 26. And in her brief opposing summary judgment, she asserts that "Padden violated the equal protection clause by harassing Williams and placing the caution alert on Williams'[s] home for no reason other than her race." Pl. SJ Opp. at 16.

Williams, however, has offered no evidence whatsoever to support the assertion in her complaint that a white gun-permit holder would not have had a caution alert placed on her premises under the same circumstances. Williams contends that because the caution alert was later removed, this is evidence that "it should never have been placed in the first place." Pl. SJ Opp. at 16. This may or may not be true — but evidence that the caution alert was wrongly placed on Williams's address is not evidence that it was wrongly placed *because of her race*. Government agents are humans, and humans make mistakes. The Equal Protection Clause is not violated every time a government employee makes a mistake that affects a member of a protected class. Even if Williams can establish that the caution alert was erroneously placed, she cannot

establish that the caution alert was erroneously placed because of her race, nor can she establish that she was treated differently from similarly situated white persons.

Williams has also failed to offer any evidence — direct or indirect — that Padden acted with racial animus in providing the information to the 911 operator that resulted in placement of the caution alert on Williams's home.  Likewise, to the extent that Williams seeks to raise a separate equal-protection claim on the basis of "harassment" by Padden during their encounter, Williams has failed to offer evidence to support a finding that Padden acted with racial animus.

At the summary-judgment hearing, Williams's counsel said that Williams testified at her deposition that Padden told her, "They'll give anyone a permit these days, won't they?"  SJ Hr'g Tr. at 10.  Although this statement could reflect racial animus (depending on what Padden meant by "anyone"), assertions by counsel are not evidence, and — contrary to her counsel's assertion — Williams did not, in fact, testify during her deposition that Padden made any such statement. Williams *did* testify that Padden questioned her about the Morgan Park shooting, but given that Williams herself told Padden that she had been in Morgan Park, this questioning is not evidence of racial animus on Padden's part.  Accordingly, no reasonable jury could find that Padden was motivated by racial animus.

In the absence of any evidence that Williams was treated differently from white citizens because of her race, and in the absence of any evidence of racial animus on Padden's part, Padden is entitled to summary judgment on Williams's equal-protection claim.

*d.  Negligence*

Williams contends that Padden was negligent in causing a caution alert to be placed on her address.  2d Am. Compl. ¶ 32 ("Padden . . . owed [Williams] a duty to refrain from incorrectly placing a caution alert on [Williams's] home.").  Padden responds that she is entitled to summary judgment on the basis of official immunity.  Mem. Supp. Def. Padden Mot. S.J. at 19-22 [Docket No. 84].  The Court agrees.

Under Minnesota's common-law doctrine of official immunity, a public official such as Padden who takes action that requires "the exercise of [her] judgment or discretion" is generally not personally liable for damages resulting from that action.  *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004) (quotations omitted); *see also AP v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1149 (D. Minn. 2008).  Conversely, official immunity does not protect public officials from liability arising from "the execution of ministerial, rather than discretionary, functions . . . ."  *Anderson*, 678 N.W.2d at 655.

Padden's decision to provide information to the 911 operator after her encounter with Williams was plainly a discretionary decision, and she is therefore presumptively entitled to official immunity.  *See Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990) ("Generally, police officers are classified as discretionary officers entitled to [official] immunity.").  To defeat the presumption of immunity, Williams must show that Padden acted willfully or with malice.  *See Schroeder v. St. Louis County*, 708 N.W.2d 497, 505 (Minn. 2006).  In this context, to act "willfully" is to "violate[] a known right," and the inquiry is objective, not subjective.  *Gleason v. Met. Council Transit Operations*, 563 N.W.2d 309, 315 (Minn. Ct. App. 1997), *aff'd in part,*

*rev'd in part*, 582 N.W.2d 216 (Minn. 1998).  That is, the applicable standard contemplates "an objective inquiry into the legal reasonableness of an official's actions."  *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994); *see also Gleason*, 563 N.W.2d at 315 (citing *Beaulieu*).

Based on the undisputed evidence, it was objectively reasonable for Padden to act as she did in providing the 911 operator with information about Williams.  In doing so, Padden did not violate any "known right" of Williams, and Padden is therefore entitled to official immunity with respect to — and summary judgment on — Williams's negligence claim.

## 2.  Claims Against Kopp and Shermer

According to Williams, defendants Kopp and Shermer violated her substantive due-process rights when they arrived at her apartment on June 4, 2007 in response to her 911 call about her son's illness.  Specifically, Williams contends that by searching her apartment with guns drawn and telling her to shut up and get out of their way despite the fact that Williams was upset and her son was sick, Kopp and Shermer acted in a way that shocks the conscience.  Pl. SJ Opp. at 14.  The Court disagrees.

As discussed above in connection with Williams's claims against Padden, Williams cannot prevail on her substantive due-process claims unless a defendant's actions both violated Williams's fundamental constitutional rights and shocked the conscience.  Williams has not identified any constitutional right that either Kopp or Shermer violated, apart from asserting that their actions "implicate Williams'[s] liberty interests" — liberty interests that are not specified — "by subjecting her to interrogation, harassment, threats, and intimidation because of her race."  Pl. SJ Opp. at 14.  In light of the complete absence of any evidence that Kopp or Shermer did

-21-

anything on account of Williams's race, the Court holds that no reasonable jury could find that Kopp and Shermer violated a fundamental constitutional right, even if they acted exactly as Williams says they did.

Further, no reasonable jury could find that Kopp's and Shermer's actions — which were motivated in part by the presence of a caution alert on her address — shocked the conscience. *Cf. Hawkins v. Holloway*, 316 F.3d 777, 786 (8th Cir. 2003) (holding that evidence of a sheriff's "abrasive conduct, verbal harassment, physical altercations of a nonsexual nature, and other unprofessional conduct" toward employees was "insufficient to support a constitutional violation"). There is no evidence that Kopp and Shermer intended to harm Williams or were deliberately indifferent to her needs. Accordingly, Kopp and Shermer are entitled to summary judgment.

### 3.  Qualified Immunity

The police-officer defendants each assert the defense of qualified immunity. Qualified immunity shields government agents from liability as long as the agent's actions are objectively reasonable in light of clearly established legal principles. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part*, *Pearson v. Callahan*, 172 L. Ed. 2d 565, 576-80 (2009). Put another way, a government agent is entitled to qualified immunity unless the right that he violated was "so clearly established at the time that a reasonable official would have understood that his conduct was unlawful under the circumstances[.]" *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).

Action that does not violate the Constitution is, by definition, objectively reasonable in light of clearly established constitutional law. Accordingly, "[i]f no constitutional right would

have been violated were the [plaintiff's] allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201; *see also Kahle*, 477 F.3d at 550 ("[D]id the official deprive the plaintiff of a constitutional or statutory right?  If not, he does not need qualified immunity, as he is not liable under § 1983.")

As discussed above, the undisputed facts establish that the police-officer defendants did not violate *any* constitutional right, let alone a clearly established right.  The police-officer defendants are therefore entitled to summary judgment on the basis of qualified immunity.[9]

4.  Claims Against the City of Duluth

*a.  Section 1983*

Williams contends that the City of Duluth is liable under § 1983 for violating her rights under the Fourteenth Amendment to due process and equal protection.  2d Am. Compl. Counts III-IV.  But, as discussed above, Williams's constitutional rights were not violated by the actions of any of the police-officer defendants.  In the absence of any constitutional violation on the part of Duluth's agents (the police officers), Duluth cannot be liable under § 1983.  *See, e.g., Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.").

---

[9]Even if the Court is mistaken about whether Williams's constitutional rights were violated, the Court would find that the police-officer defendants' actions did not violate clearly established law.  The Court would, therefore, still grant summary judgment to the police-officer defendants on the basis of qualified immunity.

Moreover, even if the Court is mistaken about whether the police-officer defendants violated Williams's constitutional rights, Williams cannot establish that Duluth is liable for those deprivations.  A municipality can be held liable under § 1983 only if the plaintiff's injury results from "execution of a government's policy or custom . . . ."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Collins*, 503 U.S. at 120-21 (citing *Monell*).

Williams contends that two policies of Duluth caused the police-officer defendants to deprive her of her constitutional rights: (1) the city's policy of "placing caution alerts on homes with no procedural safeguards for the individual homeowner," and (2) the city's "inadequate training and supervision of police officers."  Pl. SJ Opp. at 17.  But Williams has no evidence that either of these alleged policies caused her any injury.

Williams contends, with respect to both policies, that Duluth's "inadequate policies are demonstrated in the pattern of unconstitutional conduct from [the police-officer defendants] over the course of eight months and multiple separate encounters."  Pl. SJ Opp. at 18.  This argument is, of course, entirely circular:  Williams asserts that her constitutional rights were violated by Duluth police officers and asks the Court to conclude, from those very violations, that Duluth's policies must have given rise to the violations.  Such circular reasoning does not satisfy *Monell*. If it did, then practically *every* constitutional violation by a municipality's agent would give rise to municipal liability.

With respect to the caution alert, Williams further asserts that Duluth's "inadequate policies" are shown by the fact that the alert "was eventually lifted and Defendants admit it was inappropriately placed."  *Id.* at 18.  But this is yet more circular reasoning:  Even if the caution alert was wrongly placed on Williams's home and her constitutional rights were thereby violated,

-24-

the mere fact of a constitutional violation does not establish that the violation resulted from

municipal policy or custom.[10]

Because Williams has no evidence that a municipal policy or custom caused a

constitutional violation, Duluth is entitled to summary judgment under *Monell*.

### b.  Negligence

Duluth contends that it is entitled to summary judgment on Williams's negligence claims

on the basis of vicarious official immunity.  The Court agrees.

Under the doctrine of vicarious official immunity, public entities are immune from

liability for certain actions of their employees.  The Minnesota Supreme Court held in *Schroeder*

*v. St. Louis County* that a court should extend vicarious official immunity to public entities if the

court concludes that public policy warrants such an extension. 708 N.W.2d at 508 ("Ultimately,

the extension of vicarious official immunity is a policy question for the court.").  And Minnesota

courts have routinely extended vicarious official immunity to a public agency when they find that

an employee of the agency is protected by direct official immunity.  *See AP v. Anoka-Hennepin*

*Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d at 1150-51.  The Court holds that under Minnesota law,

vicarious official immunity extends to Duluth, and Duluth is therefore entitled to summary

judgment based on that doctrine and on the Court's holding, discussed above, that the police-

officer defendants are protected from liability by direct official immunity.

---

[10]Further, as noted above, the fact (if it is a fact) that the caution alert may have been mistakenly placed does not mean that it was *unconstitutionally* placed.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED that:

1.      The motion for summary judgment of defendant Ann Padden [Docket No. 61] is

        GRANTED.

2.      The motion for summary judgment of defendants Rebecca Kopp and Todd

        Shermer [Docket No. 69] is GRANTED.

3.      The motion for summary judgment of defendant City of Duluth [Docket No. 90]

        is GRANTED.

4.      The motion for summary judgment of defendant Brian Jones [Docket No. 91] is

        DENIED AS MOOT in light of the Court's order dismissing Williams's claims

        against him [Docket No. 114].

5.      Plaintiff's complaint is DISMISSED WITH PREJUDICE AND ON THE

        MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  February 23, 2009                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge